UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUSSELL F. SHEEHAN, Administrator,<br><br>Plaintiff,<br><br>v.<br><br>NETVERSANT-NEW ENGLAND, INC. and Walsh Brothers, Incorporated, Maiuri Electrical Company, Daisy Electric, Inc., and Partners Healthcare Systems, Inc.,<br><br>Defendants. | Civil Action No. 04-10559NG |

**NETVERSANT'S OPPOSITION TO THE**
**MOTION FOR A PRELIMINARY INJUNCTION**

NetVersant-New England, Inc. ("NetVersant" or the "Company"), a telecommunications services company, got caught in the middle of a jurisdictional dispute between two locals of the International Brotherhood of Electrical Workers ("IBEW" or the "International"), Local 103 and Local 2222. In conjunction with the Business Managers of these two locals, who personally participated in ensuing negotiations, and a Vice President of the International, who likewise participated personally in the negotiations, the Company entered into a Jurisdictional Agreement in October 1998 (the "Jurisdictional Agreement") that assigned some job categories to Local 103 (generally, the more traditional electricians' jobs) and others to Local 2222 (generally, those that relate more to telecommunications activities). *See* Affidavit of Robert N. Feldman ("Feldman Aff.") ¶¶ 3-6. The parties operated under this Jurisdictional Agreement for three years, until January 2002, when Local 103 filed a

grievance complaining that not all of the company's electrical work was being assigned to members of Local 103. *Id.* ¶ 7-10. The company asserted the Jurisdictional Agreement in connection with the arbitration of this grievance, *id.* ¶ 11, and the subsequent proceedings are recited in the plaintiff's moving papers: the arbitrators found the Jurisdictional Agreement unenforceable and ordered the company to assign all future electrical work to Local 103 and to make "appropriate" adjustments retrospectively back to 1998; this Court enforced the arbitral decision in deference to the process; and the First Circuit affirmed for the same reason.

The arbitral award in February 2002 eliminated the Jurisdictional Agreement as a solution to the jurisdictional dispute that had precipitated it; it did not eliminate the dispute. Feldman Aff. ¶ 12. Following the arbitral award and throughout the ensuing proceedings, the parties tried but could not arrive at a better solution to the jurisdictional dispute than the solution they had arrived at in 1998 – the Jurisdictional Agreement – and while they continued discussions among themselves in an effort to solve the problem in some other way, they continued acting in accordance with their earlier agreement. *Id.* ¶¶ 13. The Business Manager for Local 103 was directly and substantially involved in these discussions, and he shared the understanding that the Jurisdictional Agreement remained the only blueprint for action acceptable to any degree by all of the participants. *Id.* ¶¶ 14-15.

Local 2222 employees of NetVersant have throughout participated in Company-sponsored health and pension plans, as they do now. Feldman Aff. ¶ 24. The Company has been making contributions to these plans and paying benefits from them according to their terms throughout these events, and it continues to do so. *Id.* The Local 103 plans

have known the identities of some if not all of the company's Local 2222 employees since at least as early as the January 2002 arbitration. *Id.* ¶ 26. The Local 103 plans likewise have known throughout of the ongoing negotiations among Local 103 officials, Local 2222 officials, representatives of the International and representatives of the Company to resolve the jurisdictional dispute between the two locals; and they have known that the parties were operating throughout this 2-year period under the Jurisdictional Agreement. *Id.* ¶ 18. Until December 2003, the Local 103 plans made no objection to the ongoing negotiations or the use of the Jurisdictional Agreement as a *modus operandi* in the meantime. *Id.* ¶ 19. In December 2003, the Local 103 plans made objection but offered no better alternative, and negotiations stalled. *Id.* ¶23. This lawsuit ensued. *Id.* ¶¶ 21-23. The Local 103 plans have not sent enrollment forms to any Local 2222 employees of the company, and they have not advised any of them of their rights under any of the plans. *Id.* ¶ 26.

The requested preliminary injunction should be denied because, as the foregoing facts demonstrate:

- The Local 103 plans have breached their "watchdog" duties as fiduciaries under ERISA to inform all plan participants, including Local 2222 members employed by the Company, at least some of whose identities they know, of their participation in the plans and their rights under them; as a result, their receipt of the sums they request would result in a windfall to the plans caused by their breach of duties, and they are barred from compelling payment of that windfall. *See, e.g., Agathos v. Starlite Motel,* 977 F. 2d 1500, 1507 (3rd Cir. 1992). **See also point I, below.**

- The plaintiff's delay in filing this action – which is over two years from issuance of the arbitral order forming the basis of the action and over a year from the First Circuit's affirmance of that order – demonstrates that there is no risk of immediate harm, which alone can support preliminary injunctive relief. *See, e.g., FIBA Leasing Co., Inc. v. Airdyne Inds., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993). **See also, point II.A, below.** It demonstrates equally that a preliminary injunction is not needed to avoid irreparable harm, which, again, is a prerequisite for issuance of such an order. *See e.g., Foxboro Co. v. Arabian Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986). **See also point II.B, below.**

- During this period of delay, when the Plaintiff took no steps to advise affected employees of their participation in the Local 103 plans and their rights under them, affected employees have foregone making claims against those plans that now are foreclosed, and the Company has been making payments on behalf of these employees and paying benefits to them from its own sponsored health and pension plans; therefore, the equitable defense of *laches* protects the company from the harm that would result from requiring payments of double contributions caused by the Plaintiff's delay. *See, e.g.,* **See also point III, below.**

**I.     THE PLAINTIFF'S BREACH OF HIS FIDUCIARY DUTIES TO EMPLOYEES OF NETVERSANT BARS HIS RECOVERY.**

The Local 103 plans seek recovery of contributions in respect of the hours worked by employees of NetVersant, who are members of Local 2222, which hours they say should have been worked instead by members of Local 103. Presumably, the amounts recovered would be for the benefit of the persons who actually worked the hours that generated the payments; otherwise, the recovery would be a complete and absolute

windfall that would be inequitable, inappropriate as a matter of law and thus not in conformance with the arbitral order. *See* Sheehan Aff., Exhibit 1 (arbitral award, ordering "appropriate" contributions to welfare and pension plans) and *Agathos v. Starlite Motel,* 977 F. 2d 1500 (3rd Cir. 1992) (holding that collection of contributions in respect of persons who have no viable claim for benefits is inappropriate as a matter of law). In other words, the plaintiff must be contending that the NetVersant employees who are members of Local 2222 are participants in the Local 103 plans. Otherwise, again, the recovery would not be in any sense compensatory or appropriate; it would be a windfall and unjustified by the arbitral award. *See id.*

      The Plaintiff has never treated NetVersant employees as participants in the Local 103 plans he administers. He has not taken the first step toward discharging the fiduciary duties he would owe them if they were participants in the plans, namely, the step of informing them of their participation and their resulting rights. *See, e.g.,* 29 U.S.C. §§ 1021, 1022, 1024(b) (imposing duties to provide all participating employees with certain materials describing their rights and obligations under the plans). *See also Teamsters Industrial Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F. 2d 132 (3rd Cir. 1993 (noting funds' fiduciary duties include identifying all participants and beneficiaries so that participants may be made aware of their rights and notifying participants of an employer's failure to contribute to fund as required by "pension agreement"). He has known the identities of some, if not all, of these persons since at least January 2002, when their names were entered into the record of the arbitration of the grievance that gave rise ultimately to this action. They are all members of the International, Local 2222, and their identities are not hidden.

While the Plaintiff disregarded the persons on whose behalf he now seeks recovery, NetVersant was funding their pensions and medical benefits, and paying their health and welfare claims and their pensions under its own Company-sponsored plans. In these circumstances, the Plaintiff's breach of his fiduciary duties to the Local 2222 members he now claims as participants in his plans, and NetVersant's discharge of its responsibilities to those same persons, would cause the Plaintiff's collection of what he seeks to amount to an inequitable windfall, which the law does not permit, let alone require. *See, e.g., Agathos v. Starlite Motel,* 977 F. 2d 1500 (3rd Cir. 1992). *See also Calif. Svc. Employees Health and Welfare Trust Fund v. G.C. Theater Corp.*, 1998 WL 320846, *7 (N.D. Cal. 1998).

*Agathos* is directly on point. In *Agathos*, the plaintiff-administrator of multi-employer health and pension plans sought delinquency payments on behalf of "unreported" employees of the Starlite Motel. The action was brought years after the period in respect of which delinquency payments were sought; and the record did not show which if any employees were able at the time of the action to validly claim benefits under the plans. The court noted:

> If the employees cannot assert such claims, then a judgment for the funds would compel Starlite to contribute to plans from which its employees obtained no benefits in the past and are powerless to derive any future benefits. A judgment for the Funds under these circumstances would be a pure windfall.

977 F. 2d at 507. Accordingly, the Court held that Starlite would not be obliged to make contributions in respect of any unreported employee who has no viable claim for benefits. *Id.* Here, no more should be required of NetVersant.

## II. THE PLAINTIFF WILL NOT BE IMMEDIATELY OR IRREPARABLY HARMED IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

A preliminary injunction should not issue unless the applicant can show that "it will suffer *immediate* and *irreparable* harm absent the injunction." *FIBA Leasing Co., Inc. v. Airdyne Inds., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993) (emphasis supplied). *See also GA Enterprises, Inc. v. Leisure Living Communities, Inc.*, 355 F.Supp. 947, 948 (D. Mass. 1973) ("The test this Court must apply in deciding whether plaintiff is entitled to injunctive relief is whether plaintiff has shown *immediate* and *irreparable* harm resulting to it if said injunction is not granted….") (emphasis supplied) (citing *Automatic Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113, 115 (1st Cir. 1968) (reciting standard)). Here, the plaintiff cannot show either immediate or irreparable harm.

### A. The Plaintiff's Delay In Bringing This Lawsuit Belies Any Claim Of "Immediate" Harm

The Plaintiff waited two years to file this case, perhaps hoping (as was NetVersant) that the Local unions would find some way to resolve their jurisdictional dispute that did not harm too many workers or others. That same motivation should have prevented the Plaintiff's change of heart in December 2003, and it should have prevented the filing of this action altogether. Be that as it may, it demonstrates that there is nothing immediate about this action except the Plaintiff's loss of patience, and that does not suffice to justify a preliminary injunction. *See, e.g., Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98 (D. Mass. 1996) ("[T]raditionally, plaintiffs' delay in filing suit rebuts the presumption of irreparable harm to them, making preliminary injunctive relief inappropriate."); *accord FIBA Leasing Co*, 826 F. Supp. at 39 (plaintiff must show "immediate" harm). *See also In re Microsoft Corp. Antitrust Lit.*, 333 F.3d 517, 529-30

(4th Cir. 2003) ("the conditions and principles of equity … require immediacy of irreparable harm for all preliminary injunctions.") (internal citation and quotation marks omitted).

### B. The Plaintiff Cannot Show A Risk Of Irreparable Harm.

The Plaintiff likewise cannot show any irreparable harm from the absence of immediate relief. Lack of money is almost never irreparable. *See Foxboro Co. v. Arabian Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986) ("We do not find irreparable injury where only money is at stake and where the plaintiff has a satisfactory remedy at law to recover the money at issue"); *Auburn News. Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir. 1981) ("We adhere, of course, to the basic requirement … that before [injunctive] relief becomes available, there must be a showing that there is no adequate remedy at law. … [H]owever strong appellees [sic.] case may be on the merits …, they cannot secure preliminary injunctive relief unless they can show that an adequate remedy at law is not present.").

Speculation about NetVersant's ability to pay a judgment – s*ee* Plaintiff's Memorandum In Support of Motion for Temporary Restraining Order/Preliminary Injunction at 16 – is unsupported by any evidence; and it is doubly doubtful in light of the Plaintiff's inability to distinguish between the Local 2222 employees (if any) on whose behalf he is permitted to recover contributions – because they have viable claims for benefits from the plans administered by the Plaintiff – and those on whose behalf contributions would be an impermissible windfall. *See,* point I, *infra.* This doubly doubtful speculation does not amount to the requisite showing of irreparable harm. *See Tebbs v. Springfield Press & Machine Co.*, 1992 WL 237296 (D. Me. 1992) (finding no

showing of irreparable harm where plaintiff claimed, without support, that directors might divest defendant of assets and render defendant unable to pay judgment); *cf. Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52-53 (allowing injunction to protect assets where plaintiffs showed that defendant was insolvent, that its business was at a standstill, and that it was threatened with many lawsuits.).

The irreparable harm alleged to stem from the Plaintiff's inability to do a full accounting for the money he says is owed, the recovery of which would improve the financial condition of the plans he administers, is equally speculative, and probably illusory.  As to the pension plans, accrual of the contributions would be offset by accrual of the liabilities that go along with the contributions; the receipt of pension contributions would generate offsetting pension obligations; and there is no evidence that the income would exceed the liabilities.  *See* 11 U.S.C.§ 412 and 29 U.S.C. § 1082.  As for health and welfare plans, the Plaintiff would be entitled to receive contributions in excess of likely claims if he were entitled to recover the windfall that *Agathos* prohibits; but he is not.

### III.    PLAINTIFF'S RECOVERY IS BARRED BY THE EQUITABLE DEFENSE OF LACHES.

The Plaintiff has known since October 1998 or thereabouts that NetVersant was acting in accordance with the Jurisdictional Agreement under which some work covered by the Local 103 collective bargaining agreement was performed by employees of the Company, who are not members of Local 103 and on whose behalf pension and welfare contributions were made to Company-sponsored plans and not to Local 103 plans.  He did nothing to collect contributions in respect of that work before the 2002 arbitration or afterwards, up to April 2004, when he filed this action.  He voiced no objection to that

course of conduct until late 2003.  For more than five years, he watched as NetVersant engaged in conduct – the funding and payment of claims and pensions under the company's plans – that he knew with absolute certainty would be unnecessarily harmful to NetVersant if he were to force the company to make duplicate contributions in respect of the same employees for the same work to his Local 103 plans.  He could have intervened at any point to minimize the unnecessary harm that would ensue, given that he would intervene at some point.  Instead, he waited, letting the unnecessary harm expand.  And NetVersant relied – to its detriment, it is now clear – on his acquiescence.

That kind of gratuitous infliction of harm is not equitable, and equity will not condone it by the issuance of a preliminary injunction: the defense of laches bars an equitable remedy where, as here, the applicant delays filing suit knowing that the delay will cause unnecessary harm to the defendant without any compensating good.  In short, "[t]he equitable doctrine of laches bars assertion of a claim where a party's delay in bringing suit was 1) unreasonable, and 2) resulted in prejudice to the opposing party."  *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989).  *See also* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 11A Federal Practice and Procedure (Civil) §2946 (1995 and 2003 Supp.) (collecting cases).  As this Court recently explained:

> Put simply, laches directs a court to bar the assertion of a claim where a party has "slumbered" on his or her rights to the detriment of the other side.  It derives from a concern for procedural fairness, rather than for the merits of the claim ….  Laches has special resonance in the context of a request for preliminary relief, when, in effect, the plaintiffs claim urgent action must be taken.

*Boston's Children First v. City of Boston*, 62 F. Supp. 2d 247, 254 (D. Mass. 1999) (Gertner, J.).  *Accord Stewart v. Finkelstone*, 206 Mass. 28, 36 (1910):

> If there has been unreasonable delay in asserting claims or if, knowing his rights, a party does not seasonably avail himself of means at hand for their enforcement, but suffers his adversary to incur expense or enter into obligations or otherwise change his position, or in any way by inaction lulls suspicion of his demands to the harm of the other, or if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse her aid for the establishment of an admitted right, especially if an injunction is asked. It would be contrary to equity and good conscience to enforce such rights when a defendant has been led to suppose by the word or action of the plaintiff that there was no objection to his operations.

*Id.* Such a circumstance clearly exists here.

Perhaps the Plaintiff delayed filing this action with the hope that the disputing unions would be able to negotiate an acceptable resolution of their jurisdictional dispute, which would no doubt relieve NetVersant of some if not all of the burden of retroactive, duplicate benefit payments occasioned by Local 103's reneging on the 1998 Jurisdictional Agreement. If that was the reason for delay, it was laudable, just as was NetVersant's reason for having continued to operate with the Local unions in accordance with the Jurisdictional Agreement until something better could be arranged. Nevertheless, just as NetVersant's good motives do not relieve it of all of the burdens imposed by the arbitral award, so too the plaintiff's good motives would not relieve him of the consequences of his delay. *See, e.g., Boston's Children First*, 62 F. Supp. 2d at 255 (finding delay unreasonable where plaintiff claimed that efforts to negotiate resolution politically stalled filing of suit; the court noting: "Although I applaud the efforts of [the plaintiff] to address this issue through the political process, it does not excuse its lack of diligence in taking legal action, or even notifying the potential Defendants of its intent to do so, once it became clear that the political process was unsuccessful.").

The fact is that whatever the Plaintiff's motivation for his multi-year delay in bringing suit, that delay has caused NetVersant substantial prejudice. Every day the Plaintiff delayed, NetVersant funded and paid claims and pensions under the company's plans – payments that Plaintiff knew would be unnecessarily harmful to NetVersant if he were to force the company to make duplicate contributions to his Local 103 plans in respect of the same employees for the same work. The Plaintiff's current claim for duplicate contributions – which is the direct result of his delay – is the paradigm of prejudice against which the defense of laches protects.

## CONCLUSION

For the foregoing reasons, the Plaintiff's motion for a preliminary injunction and for an order to reach and apply should be denied.

>Respectfully submitted,
>
>NETVERSANT-NEW ENGLAND, INC.
>
>By its attorneys,
>
>_/s/ Steven A Kaufman_
>David M. Mandel (BBO # 317000)
>Steven A. Kaufman (BBO # 262230)
>David M. Stringer (BBO # 643526)
>ROPES & GRAY LLP
>One International Place
>Boston MA 02110-2624
>(617) 951-7540

Dated: April 23, 2004