UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RUSSELL F. SHEEHAN, et al | ) | |
| | ) | CIVIL ACTION |
| Plaintiff, | ) | NO. 04-10559-NMG |
| v. | ) | |
| | ) | |
| NETVERSANT-NEW ENGLAND, INC., et al | ) | |
| Defendants, | ) | |

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

INTRODUCTION

Plaintiff Russell F. Sheehan (the "Administrator") seeks to amend his Amended Complaint, filed on April 12, 2004, to assert two RICO claims against proposed defendants NetVersant Solutions, Inc. ("NetVersant Solutions") and its individual officers Scott Fordham, Ronald Hale, Jr., William Fiedler and Robert Feldman (collectively the "RICO Defendants"). The amendment is sought as a result of discovery and other information obtained in this case since its filing. The proposed Second Amended Complaint (the "AC") also seeks to hold NetVersant Solutions, the parent company of NetVersant-New England, Inc. ("NetVersant NE"), liable for the $7,442,995.50 and still growing[1] debt to the Administrator as the alter ego of NetVersant NE. *See* AC, ¶20.

The AC alleges that the RICO Defendants used the mails and interstate wires to defraud two of the Administrator's Funds,[2] the Pension Fund and the DI Fund out of millions of dollars of their assets

---

[1]Through discovery in this case, payroll records through June 11, 2004 were obtained in July, 2004, and the $7,442,995.50 figure was subsequently calculated based upon these records. NetVersant NE has not supplemented these records, but the AC alleges that NetVersant NE's practice of mailing false reports to the Administrator continued after that date and still continues.

[2]The term "Funds" is used herein to mean collectively the Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Pension Fund"), the Electrical Workers Deferred Income Fund, Local 103, I.B.E.W. (the "DI Fund"), the Local 103, I.B.E.W. Health Benefit Plan ("Health Plan"), and the Joint Apprenticeship and Training Trust Fund, Local 103, I.B.E.W. ("Apprenticeship Fund"). "LMCT" refers to the Electrical Industry Labor-Management Cooperation Trust.

by illegally obtaining pension credit under the Pension Fund and DI Fund for the benefit of NetVersant NE, its employees, and NetVersant Solutions.[3]  The AC alleges that the RICO Defendants sought to increase the profits and revenue of NetVersant NE, and indirectly benefit the RICO Defendants, by defrauding the Funds and saving NetVersant NE millions of dollars in contributions, thereby also gaining a competitive edge over other employers signatory to the Telecommunications Agreements.

*After* an arbitration decision issued on February 4, 2002 (the "Arbitration Decision") ruled that NetVersant NE had to report and make contributions to the Funds and LMCT for *all* employees performing work within the Scope of Work provision of various Telecommunication Agreements, and held invalid a purported "jurisdictional agreement," the RICO Defendants conspired to ignore the Arbitration Decision when it came to NetVersant NE's obligation to report hours and make payment of contributions to the Funds.[4]  *See* AC, ¶17, 94.  The AC alleges that the RICO Defendants thereby willfully chose to violate the terms of the existing Telecommunications Agreement governing the period March 1, 2000 through February 28, 2003 (the "Telecommunications Agreement (2000-2003)") and also a successor agreement with the same Scope of Work provision (the "Telecommunication Agreement (2003-2008)").  As a result, the RICO Defendants thereby are illegally obtaining pension credit under the Pension Fund and DI Fund for the employees of NetVersant

---

[3] The AC alleges that under federal law, the Pension Fund and DI Fund are required to provide pension credit or allocations to accounts, respectively, to comply with the requirements applicable to qualified pension plans under 26 U.S.C. §401(a) to provide definitely determinable benefits.  *See* AC, ¶102-103, 109.  As described *infra*. at II.A.4, obtaining such pension credit or allocations through such means is an indictable offense under 18 U.S.C. §664.

[4] A true copy of the Arbitration Decision *sans* exhibits is attached as Exhibit 1 to the proposed Second Amended Complaint.  The Arbitration Decision was confirmed on August 30, 2002 by a judgment entered in *JCI Communications, Inc. d/b/a NetVersant-New England-New England v. International Brotherhood of Electrical Workers Union, Local 103*, 2002 U.S. Dist. LEXIS 16283 (D. Mass. 2002) and affirmed by a judgment entered on appeal by the United States Court of Appeals for the First Circuit and reported at 324 F.3d 42 (1st Cir. 2003).  Thus the Arbitration Decision is now a final judgment. AC, ¶17.  The AC also alleges that NetVersant NE was also required to file with the Administrator corrected payroll reports to include employees omitted from reports filed for the months October 1998 and thereafter.  AC, ¶18, 23.

NE. AC, ¶100. The RICO Defendants hid their fraud by mailing to the Funds each month since February 2002 false payroll reports (and by failing to file corrected reports) which omitted 640,195.95 hours, a practice which continues to this day. *See* AC, ¶60-94.

The AC alleges that the RICO Defendants exercised excessive and complete control of NetVersant NE through appointment of officers of NetVersant Solutions to run NetVersant NE, by weekly telephone conferences via wire and wireless e-mail, by implementation of an Oracle software system that allowed NetVersant Solutions to exercise *daily* control of the operations of NetVersant NE in real time, by requiring all key hiring to be directed by the RICO Defendants, by advertising positions for NetVersant NE as employment *by* NetVersant Solutions, and the other acts set forth in the AC. NetVersant Solutions effectively stripped NetVersant NE of its only real assets by requiring that accounts receivables be placed under its control and that NetVersant NE requisition to Houston and NetVersant Solutions for approval to pay bills or to enter into important contracts.

The AC alleges that the RICO Defendants diverted assets of NetVersant NE for the benefit of NetVersant Solutions rather than pay its contributions to the Funds. The RICO Defendants have left NetVersant NE as an undercapitalized shell corporation which is used as a vehicle to underbid its competitors, siphon off its receivables, place control of the servicing of accounts away from NetVersant NE to a new company under the control of NetVersant Solutions, namely NetVersant National, Inc. (AC, ¶50), and if the Arbitration Decision is enforced, only an insolvent subsidiary would be left in their wake with the Pension Fund and DI Fund obligated to provide millions of dollars in pension credit or allocations to such employees. *See infra*. III.A.4.

The proposed alter ego count alleges that NetVersant Solutions should be held liable for the debts of NetVersant NE as its alter ego. As set forth more fully *infra*. at III.B., the AC alleges facts that more than meet the required threshold for holding NetVersant Solutions liable for the debts of

NetVersant NE.

ARGUMENT

I. PLANITIFF'S MOTION SHOULD BE ALLOWED UNDER THE LIBERAL AMENDMENT POLICY SET FORTH IN FED.R.CIV.P. 15 BECAUSE THE PROPOSED AMENDMENTS STATE COLORABLE GROUNDS FOR RELIEF, OCCUR EARLY IN THESE PROCEEDINGS AND DO NOT UNDULY PREJUDICE DEFENDANT'S RIGHTS IN THIS ACTION.

The proposed amendments come just months after the filing of the Amended Complaint and prior to the scheduling of the Rule 16 scheduling conference. No undue prejudice to the Defendant will result, who has itself sought and obtained leave to file a motion to file a third party complaint against new parties.

The decision to grant leave to amend a pleading is left to the sound discretion of the trial court, which should freely allow such motion when "justice so requires." Fed.R.Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Where a proposed amendment would not be futile, absent undue prejudice to the defendant, leave to amend generally should be granted. *See Clair Recreation Center, Inc. v. Flynn*, 897 F.2d 623, 625 (1st Cir. 1990); *Gaffney v. Silk*, 488 F.2d 1248, 1251 (1st Cir. 1973). Absent a substantial reason to deny leave to amend, a district court's discretion is not sufficiently broad to permit denial. *Thomas v. Davie*, 847 F.2d 771, 773 (11th Cir. 1988). This is true even if such motion is made years after the commencement of the original complaint if there was not purposeful dilatoriness or bad faith by the plaintiff. *See Island Creek Coal, Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279 (4th Cir. 1987).

Here the amendment comes just months after the filing of the Complaint and prior to the court's setting of the first scheduling conference. *See Santiago-Marrero v. United States*, 61 Fed. Appx. 718, 2003 U.S. App. LEXIS 6226 (1st Cir. 2003)(finding a period of four months to be "fairly brief" and to not warrant denial of a motion for leave to amend on timeliness basis.); *Carmona v. Toledo*, 215 F.3d

4

124, 136 (1st Cir. 2000); *Cabana v. Forcier*, 200 F.R.D. 9, 13 (D. Mass. 2001)(granting leave to amend complaint where "colorable grounds for relief" have been set forth in proposed amended complaint, even where the merits of such claims appear to the court to be "dubious at best"). Furthermore, the addition of the RICO Defendants is warranted in that it will allow adjudication of the Administrator's claims against NetVersant NE and the RICO Defendants in one forum rather than requiring the Administrator to institute a separate action and is grounds to permit such an amendment under Rule 15. *Smith v. Mitre Corp.*, 949 F. Supp. 943, 953 (D. Mass. 1997). *See Sigros v. Walt Disney World, Co.*, 190 F. Supp.2d 165 (D. Mass. 2002). In addition, the additional claims derive from information obtained by the Administrator through discovery in this case and from information first obtained after the Amended Complaint was filed. Thus there was no dilatoriness on the Administrator's part in bringing his Motion at this time.

II.  THE DEFENSES RAISED BY NETVERSANT NE TO THE UNDERLYING CLAIM FOR CONTRIBUTIONS UNDER ERISA AND THE LMRA ARE WITHOUT MERIT.

The Arbitration Decision is a final judgment that ruled that all employees of NetVersant NE working within the Scope of Work provision of the Telecommunications Agreements are covered employees requiring contributions to the Funds and LMCT. Under principles of offensive issue preclusion, the Administrator is entitled to enforcement of this judgment and has set forth, at a minimum, a colorable claim for unpaid contributions against NetVersant NE in the principal amount through June 11, 2004 of $7,442,995.50 and to an unspecified amount thereafter. *See* 29 U.S.C. §515; *Apparel Art Intern. Inc. v. Amertex Enterprises, LTD., et al.*, 48 F.3d 576, 585 (1st Cir. 1995)(stating that arbitration award has res judicata effect); *NLRB v. Donna-Lee Sportswear Co., Inc., et al.*, 836 F.2d 31 (1st Cir. 1997); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)(plaintiff may use final judgment to collaterally estop defendant from re-litigating issues).

The equitable defenses of *laches*, estoppel and unclean hands raised by NetVersant NE in its Answer, as well as its contention that the Funds and LMCT would be unjustly enriched, are without merit and certainly do not weigh against the AC stating colorable claims for relief. Equitable defenses can apply only when a plaintiff seeks to invoke equity and not to defeat a claim for money damages under a written contract. *Ivani Contr. Corp. v. City of New York*, 103 F.3d 257, 259 (2nd Cir. 1997); *See Harris v. Harvard Pilgrim Healthcare, Inc.*, 208 F.3d 274, 279 (1st Cir. 2000)(holding unjust enrichment defense inapplicable to defeat payment terms under written contract); *Bd. of Trs. of the Masons v. O'Donnell Plastering*, 2002 U.S. Dist. LEXIS 25435 (N.D. Ill. 2003).[5] Moreover, *laches* may not be used as a defense to shorten the statute of limitations applicable to a money damages claim under federal law. *Ivani Contr. Corp.*, 103 F.3d at 259. Nor can the equitable doctrine of unclean hands resulting from alleged union misconduct prevent enforcement of a valid collective bargaining agreement. *O'Donnell Plastering*, 2002 U.S. Dist. LEXIS at 25435. Even assuming *arguendo* that *laches* or estoppel can be raised as a defense in an action to collect contributions under ERISA §515, NetVersant NE fails to show that the Administrator failed to act in a timely manner to enforce the Arbitration Decision and how NetVersant NE reasonably relied upon such inaction to its prejudice. *See Teamsters & Employers Welfare Trust of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877, 885 (7th Cir. 2002)(without deciding whether *laches* could be raised as a defense, reversing district court's application of *laches* after finding unreasonable company's asserted reliance). As a non-party to the Arbitration Decision, the Administrator could only seek enforcement of the Arbitration Decision after

---

[5]This is even more true in actions under 29 U.S.C. §1145, where equitable defenses that may be raised to collection of contributions owed under a collective bargaining agreement are typically precluded. *See*, *e.g.*, *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989)(holding that ERISA §515 precludes nearly all defenses to an employer's making of contractually required contributions).

it had become a final judgment on June 30, 2003.[6]  *See NLRB v. Donna-Lee Sportswear Co., Inc., et al.*, 836 F.2d 31, 34 (1st Cir. 1997)(finality of judgment required).  At their *first* meeting held in July 2004 after the Arbitration Decision became final, the Trustees authorized the Administrator to seek enforcement of the Arbitration Decision.  The record in these proceedings demonstrates that the Administrator, just one month later, made demand on NetVersant NE through his counsel on August 29, 2003 for submission of all required corrected monthly payroll reports concerning any previously unreported employees and payment of contributions.[7]  It was NetVersant NE who sought to delay the filing of these proceedings by requesting settlement discussions and promising to provide payroll and other information that was never provided, leading to another demand letter dated December 4, 2003.  *See* footnote #10, ¶8, Exhibit 4.  Thus NetVersant NE's *laches*, estoppel and unclean hands defenses lack any factual support and are easily debunked by documents on the Court's docket or from which it may take judicial notice.  NetVersant NE has done everything to conceal from the Administrator the hours that are the subject of this litigation by not reporting them on certified monthly payroll reports as required by the Arbitration Decision and the Telecommunications Agreements.  NetVersant NE has not complied with its contractual obligations and should not be shown equity to vitiate Telecommunications Agreements so it can obtain the benefit of such agreements without the burden.  Nor should equity be used to reward it for violating federal law.[8]

    Nor will the Funds and LMCT be unjustly enriched by payment of contributions required to be

---

[6] While the Arbitration Decision issued on February 4, 2002, the parties to that decision litigated its validity in appeals that ended with the First Circuit's decision on March 31, 2003 and the passing of the appeal period to the United States Supreme Court 90 days later on June 30, 2003.

[7] *See* Docket entry #4, Affidavit of Russell F. Sheehan, filed in this case on August 12, 2004 in support of his motion for temporary restraining order/preliminary injunction, ¶8.

[8] The Administrator's action also seeks contributions incurred *after* the Complaint was filed in this action, and it is difficult to see how Defendant can argue *laches* applies to these contributions.

paid under the Telecommunications Agreements. This defense fails for many reasons, the first and foremost being that unjust enrichment may not be used to excuse payment obligations in a written contract. *See Harris*, 208 F.3d at 279. The second is that it is an untrue statement. The contributions payable to the LMCT are not intended for the benefit of participants but instead to maintain an industry improvement labor-management fund. The contributions to the Apprenticeship Fund are to maintain a school for apprentice training. As set forth more fully *infra*. at III.A.4, if the Court holds the Arbitration Decision enforceable and upholds the Administrator's claims, the Pension Fund and DI Fund are required by law to credit employees with hours of service even if these funds fail to collect all contributions owed. While the Health Benefit Plan is not required to, and does not, extend coverage to employees unless the employer pays the required premium, it is no excuse for the employer to refuse to pay the contractually required premium and enroll covered employees and then argue that its employees have not been contacted and received coverage. No principle in equity allows NetVersant NE to transform its own contractual violations and fraud into reasonable reliance. As one court remarked, "[t]o allow such a failure to create an estoppel, however, would be to equate [NetVersant NE] to a person who thought that because a store had failed to bill [it] for an item that [it] had bought [it] could go on buying there and never again have to pay a bill. That would be a textbook case of unreasonable reliance." *Teamsters & Employers Welfare Trust of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877, 885 (7th Cir. 2002).[9]

III. PLAINTIFF'S RICO COUNT IS NOT FUTILE AND SETS FORTH "COLORABLE GROUNDS FOR RELIEF."

---

[9] Congress, in enacting ERISA chose to deny standing, and thereby a remedy, to employers concerning alleged acts or omissions of fiduciaries under ERISA by omitting employers from one of the enumerated persons entitled to sue under ERISA §502(a) (29 U.S.C. §1132(a)). Instead, Congress chose to limit the remedies provided, including the equitable remedies, to benefit the plan alone and not the employer. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985)(remedies for alleged fiduciary misconduct were for the plan alone). *See Reder v. Travelers Plan Admin., Inc.*, 44 F. Supp. 2d 92, 100 (D. Mass. 1999)(holding that employer lacks ERISA standing).

A.  The AC's Allegations Are Sufficient To State A Colorable Claim Under RICO.

1.  The AC sufficiently alleges colorable claims against the RICO Defendants under 18 U.S.C. §1962(c) and (d).

The Administrator's RICO claims against the RICO Defendants state colorable claims under 18 U.S.C. §1961 *et seq*. Therefore, leave to file the AC should be granted. Subject matter jurisdiction over the Administrator's RICO claims is conferred by 18 U.S.C. §1964(c) and federal question jurisdiction under 28 U.S.C. §1331. Section 1964(c) provides in pertinent part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fees....

Section 1962(c) makes it "'unlawful for any person employed by or associated with any enterprise...to conduct or participate...in the conduct of such enterprise's affairs" through the commission of two or more statutorily defined crimes – which RICO calls "a pattern of racketeering activity."'[10] *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 160 (2001). "To state a claim under §1962(c), a plaintiff must allege each of the four elements required by the statute: 1) conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity." *Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir. 1995). To state a "pattern of racketeering activity" as set forth in 18 U.S.C. §1962(c), commission of two or more of the crimes defined in 18 U.S.C. §1961(1) must be alleged. *Id*. at 444. For a discussion of these elements, *see infra*. 2, 3, and 4. It is not necessary for the Administrator to allege that the RICO Defendants have been indicted under these statutes, but only that their offenses under these statutes are indictable offenses. *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 493 (1985). Nor is the Administrator's

---

[10]Specifically 18 U.S.C. §1962(c) states: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." A "pattern of racketeering activity" is defined by 18 U.S.C. §1961(5) to require "at least two acts of racketeering activity, one of which occurred after the effective date of [18 U.S.C. §1961 et seq.] and the last of which occurred within ten years...after the commission of the prior act of racketeering activity."

burden of proof that of a criminal proceeding, *i.e.*, beyond a reasonable doubt, but instead only by a preponderance of the evidence. *Id*. at 491.

In addition to alleging the commission of two or more predicate indictable offenses defined in 18 U.S.C. §1961(1), a plaintiff must allege that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). For the predicate acts to be related, the plaintiff must establish that they "have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id*. The relatedness test has been described as not being a cumbersome one for the RICO plaintiff. *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 44 (1st Cir. 1991). Thus a series of 95 mailings of checks that extended for years related to a scheme to defraud and were found to be sufficient to satisfy RICO's relatedness requirement. *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445 (1st Cir. 1990).

The requirement that the racketeering predicates amount to or pose a threat of continued criminal activity may be shown in one of two ways. A plaintiff may satisfy the continuity requirement by showing that the frequency and duration of the predicate acts extend over a sufficient period, generally more than one year. *Id*. at 446. Alternatively, a plaintiff can satisfy the continuity requirement by showing a threat of continued repetition of the predicate acts in the future by showing that such act or acts are a regular way of conducting the enterprise. *Id*. at 448.

Section 1962(d) makes is unlawful for any person to conspire with any other person to violate 18 U.S.C. §1962(c). A conspiracy within the meaning of section 1962(d) requires proof that the defendant agreed with one or more individuals to commit at least two predicate offenses in violation of §1962(c). *Aetna Cas. Sur. Co. v. P& B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994). A "conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the

10

substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997). Nor does section 1962(d) require the commission of an overt act to further the conspiracy. *Id*. The supporters of the conspiracy "are as guilty as the perpetrators." *Id*. at 64.

Here the AC alleges colorable violations of sections 1962(c) and (d) by the RICO Defendants and that the Pension Fund and DI Fund have been injured as a result of such violations. The AC alleges sufficient allegations that the RICO Defendants conspired and acted, for the benefit of NetVersant Solutions, NetVersant NE, and its employees, to defraud the Pension Fund and DI Fund and steal, convert and abstract millions of dollars of their assets to their own use through being employed by or in association with a criminal enterprise, Netversant NE. They did this through repeatedly committing indictable offenses under four criminal statutes, three of which are predicate crimes under 18 U.S.C. §1961(1): mail fraud (18 U.S.C. §1341), wire fraud (18 U.S.C. §1343), embezzlement, theft, abstraction or conversion of employee benefit plan assets (18 U.S.C. §664), and filing fraudulent reports with an ERISA plan (18 U.S.C. §1027). *See* 2, 3 and 4 *infra*. The AC alleges that the RICO Defendants exercised complete domination of Netversant NE, diverted its assets to NetVersant Solutions use and benefit, and made or participated and supported the scheme to defraud the Pension Fund and DI Fund by mailing, over some 30 months and as a ongoing pattern, false payroll reports to conceal the illegal credited service and allocations being obtained under the Pension Fund and DI Fund for NetVersant NE's employees. The RICO Defendants conspired, typically in weekly telephone conference calls held on Tuesday of each week, but also at other times, and through use of e-mail and radio e-mail, to cause NetVersant NE to have employees accrue massive unreported hours covered by the Telecommunications Agreements and to fail to make payment of such contributions. AC, ¶57-59. Netversant NE caused employees to accrue 640,195.95 unreported hours for which the RICO Defendants had no intention of making contributions for as required by the Telecommunications

Agreements. AC, ¶21. To hide their fraud, the AC alleges that the RICO Defendants went as far as having proposed defendant Robert Feldman send a false statement of hours to the Funds. Proposed defendant Feldman knowingly misrepresented the previously underreported hours under the Telecommunications Agreements by reporting to the Funds that 146,302 hours were unreported for the period November 1, 1998 through December 6, 2003. AC, ¶98. Through discovery the records revealed in excess of 600,000 hours. The AC alleges that Feldman provided such false information to mislead the Funds into believing that less money is owed to them and to fraudulently induce the Funds to refrain from filing litigation and consider accepting in settlement less money to satisfy NetVersant NE's obligation to the Funds. *Id*. The AC alleges that the RICO Defendants elected to remain bound under the Telecommunications Agreement (2003-2008) after the Arbitration Decision determined that all employees working within the Scope of Work clause of that agreement, including IBEW 2222 members, were covered employees for whom contributions must be made to the Funds. The AC alleges that as a result of the RICO Defendants' scheme to defraud, Netversant NE thereby obtained the benefits of being an IBEW 103 union contractor without the obligations, thereby underbidding its competition and siphoning off the assets of Netversant NE for the benefit of its sole shareholder, Netversant Solutions. AC, ¶101, 104-105. The AC alleges that some of the benefits of being a union signatory included making Netversant NE available for subcontracts from other signatory contractors, such as the Reach and Apply Defendants, and also allowed them to continue to work on many state owned projects that were subject to union only requirements and which Netversant NE has a substantial client base. *Id*. The AC alleges that Netvesant NE obtained a significant competitive advantage by not paying the contributions owed to the Pension Fund and DI Fund, as well as to the other Funds. *Id*.

    The AC alleges that the RICO Defendants caused Netversant NE to become bound, and remain

bound, to the Telecommunications Agreement (2003-2008) with the intent of not reporting and paying for all required contributions. AC, ¶100. The AC alleges that in each case the reports were mailed via the United States Postal Service to the Administrator and that these 32 acts, which acts are alleged to be ongoing, each violated the mail fraud statute (18 U.S.C. §1341) and ERISA's criminal fraudulent reporting statute (18 U.S.C. §1027). In addition, the AC alleges that these same defendants have sought to defraud and will have defrauded the Pension Fund and DI Fund by fraudulently obtaining credited service and encumbering millions of dollars of assets of the Pension Plan and DI Plan.

    2.    The AC sufficiently alleges multiple mail fraud and wire fraud indictable offenses against the RICO Defendants under 18 U.S.C. §1341 and §1343.

To establish violations of the mail and wire fraud statutes, the Administrator must prove that the RICO Defendants engaged in a scheme to defraud with specific intent to defraud and that they used the United States mails or interstate wires/radio in furtherance of the scheme. *Perez v. Volvo Car Corp.*, 247 F.3d 303, 313 (1st Cir. 2001). The same elements apply to both mail and wire fraud. *In re Phillips Petroleum Lit.*, 881 F.2d 1236, 1249 (3rd Cir. 1989). A specific intent to deceive can be found from material misstatement of fact made with reckless disregard for the facts. *Id.* Mail and wire fraud statutes reach schemes in which the defendant does not himself use the mail or wires if he caused the mailings or wires. *United States v. Calvert*, 523 F.2d 895, 903 (8th Cir. 1975), *cert. denied*, 424 U.S. 911 (1976). A conviction can also result if it is shown that a person acted with another in a common scheme by which it was foreseeable that the mails or wires would be used. *See United States v. Goldstein*, 532 F.2d 1305, 1316 (9th Cir. 1976), *cert. denied*, 429 U.S. 960 (1976). A plaintiff need not prove that he justifiably relied upon the a defendant's misrepresentations, because that is inconsistent with that statutes' intent to prohibit *schemes* to defraud, whether or not successful. *Neder v. United States*, 527 U.S. 1, 25 (1999). A

scheme to deprive a person of property constitutes fraud within the meaning of the mail and wire fraud statutes. *United States v. Bishop*, 825 F.2d 1278, 1280 (8th Cir. 1987). Obtaining services or goods on credit with no intent to pay falls within the prohibitions of the mail and wire fraud statutes. *United States v. Pritchard*, 773 F.2d 873, 878 (7th Cir. 1985), *cert. denied*, 474 U.S. 1085 (1985); *United States v. Owen*, 492 F.2d 1100, 1103 (5th Cir. 1974), *cert. denied*, 419 U.S. 965 (1974). It is enough that a defendant participated in the scheme; he need not have devised it. *United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2002).

The RICO Defendants caused Netversant NE to mail false monthly Payroll Reports after their knowledge of the Arbitration Decision and over a period of years, which violations continue. AC, ¶106, 107. The RICO Defendants used or conspired with others to use the wires and radio, through telephone and e-mail and wireless e-mail, to implement, monitor and further their scheme to defraud the Pension Fund and DI Fund through obtaining pension credits without payment. AC, ¶108.

> 3. The false reports caused to be filed by the RICO Defendants and/or not corrected after the Arbitration Decision was issued violated the anti-fraud provisions of 18 U.S.C. §1027.

As part of the scheme to conceal the actual hours worked by all employees covered by the Telecommunications Agreements, the RICO Defendants also caused Netversant NE to commit 32 repeated and continuing violations of ERISA's anti-fraud in reporting statute, 18 U.S.C. §1027.[11] The reference to "[w]hoever" in 18 U.S.C. §1027 includes officers of a corporation who cause

---

[11] Section 1027 provides: Whoever, in any document required by title I of the Employee Retirement Income Security Act of 1974 (as amended from time to time) to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

employer contribution reports required to be filed with an ERISA covered plan to understate the employees and contributions owed to such plan. *See United States v. S & Vee Cartage Company, Inc.*, 704 F.2d 914, 917 (6th Cir. 1983), *cert. denied*, 464 U.S. 935 (1983). The corporate veil does not shield officers from liability for criminal acts even if to benefit the corporation. *United States v. Peters*, 732 F.2d 1004, 1008 (1st Cir. 1984). The reference to "records" includes payroll reports obtained from contributing employers because these records must be kept by ERISA plans under ERISA §107 (29 U.S.C. §1027) because information as to employer contributions, number of employees, and number of hours "is necessary to verify, explain, clarify or check for accuracy and completeness any report required by [title I of ERISA]," such as the "annual report" required to be filed by ERISA plans under ERISA §104 (29 U.S.C. §1024).[12] *See S & Vee Cartage Company*, 704 F.2d at 918. The knowledge required to violate 18 U.S.C. §1027 does not require a specific intent to do what the law forbids. *Id*. at 919. An act is done "knowingly" within the meaning of section 1027 if "done voluntarily and intentionally, and not because of mistake or accident." *Id*.

The AC alleges a colorable claim that the RICO Defendants conspired to "knowingly" file false Payroll Reports after the Arbitration Decision was issued and to fraudulently conceal the actual hours worked by NetVersant NE's employees within the Scope of Work clause. The AC alleges that the Payroll Reports are required to be kept under ERISA §107 because they contain payroll information and, in addition, contain information that is necessary to verify, explain, clarify or check for accuracy and completeness the annual reports filed by the Funds in accordance with ERISA §104. AC, ¶92-93. The AC also alleges that the Payroll Reports contain information

---

[12]ERISA §104(a) requires the plan administrator to file an "annual report" which requires completion of a Form 5500 series issued jointly by the Secretary of Treasury, Secretary of Labor and the Pension Benefit Guaranty Corporation. The Form 5500 requires a plan administrator to include information concerning employer contribution information, participant (employee) data which are contained on employer payroll reporting forms. AC, ¶92-94.

required to be certified to the Administrator under the Telecommunications Agreements and the Collection Policy of the Trustees of the Funds. *Id*. The AC alleges that the filing of the false Payroll Reports occurred *after* the RICO Defendants knew that the Arbitration Decision both had rejected the purported "jurisdictional agreement" as invalid and ruled that employees of Netversant NE, including members of Local 2222, who performed work within the Scope of Work clause of the Telecommunications Agreements were considered covered by the Telecommunications Agreements. The AC alleges that both the Arbitration Decision and the Telecommunications Agreements require that contributions be paid to the Funds at the rates stated in the Telecommunications Agreement for such employees of Netversant NE.

    4.    The AC alleges colorable violations by the RICO Defendants of 18 U.S.C. §664.

The AC alleges sufficient factual allegations to support that the RICO Defendants have used Netversant NE to steal and unlawfully and willfully to abstract and convert assets of the Pension Fund and DI Fund to the use of Netversant NE, its employees, and to the direct and indirect benefit of Netversant Solutions in violation of 18 U.S.C. §664.[13] Notably, "[v]iolation of the statute cannot be condoned simply because it is accomplished by subtle or indirect means." *United States v. Andreen*, 628 F.2d 1236, 1247 (9th Cir. 1980). A theft occurs in the context of section 664 if the offense "includes a taking or appropriation that is unauthorized, if accomplished with specific criminal intent." *Id*. at 1241. Criminal intent may be inferred from proof the actions were unauthorized, and can be shown from concealment in filing false reports. *Andreen*, 628 F.2d at 1246

---

[13]Section 664 provides: "Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both. As used in this section, the term "any employee welfare benefit plan or employee pension benefit plan" means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974."

16

(finding concealment of information on financial reports probative of knowledge that actions are unauthorized); *See United States v. Helbling*, 209 F.3d 226, 238 (3rd Cir. 2000)(aiding in falsifying documents required to be kept by ERISA plan in violation of 18 U.S.C. §1027 sufficient evidence of criminal intent).

In order to steal or unlawfully and willfully abstract or convert assets of an employee benefit plan to one's use or that of another, it is not necessary that one physically remove assets of the plan; it is sufficient if one unlawfully and willfully creates an obligation upon the plan to make payment of benefits either presently or in the future. *See United States v. Ford*, 632 F.2d 1354, 1363 (9th Cir. 1980), *cert. denied*, 450 U.S. 934 (1981); *Andreen*, 628 F.2d at 1247. In *Ford* and *Andreen*, the court held 18 U.S.C. §664 violated when defendants devised a scheme to obligate an ERISA pension plan by giving themselves and others credited service which obligated the plan to pay out benefits to the trustees when they retired in the future. The theft of ERISA plan assets to further the employer's business is a is also a violation of 18 U.S.C. §664. *See Helbling*, 209 F.3d at 233.

Here the AC alleges a colorable claim that the RICO Defendants have used Netversant NE to steal or unlawfully and willfully abstract or convert to their own use or to the use of another the assets of the Pension Fund and DI Fund by causing the accrual of hours of employees of Netversant NE with no intent to pay the Pension Fund and DI Fund the contributions owed by the Telecommunications Agreements for such hours. When an employer sponsors a defined benefit pension plan, like the Pension Fund, or a money purchase pension plan, like the DI Fund, it is required by the Telecommunications Agreements to make contributions based upon hours worked to fund the obligation of the Pension Fund and DI Fund to credit these hours. *See* 26 U.S.C. §401(a); 26 C.F.R. §1.401-1(b)(1)(i); Rev. Rul. 85-130, 1985-2 CB 137. *See Ford*, 632 F.2d at 1363; *Andreen*, 628 F.2d at 1247. The AC alleges that if the Pension Fund prevails on its claim against NetVersant NE for

contributions, the Pension Fund will have through June 11, 2004 incurred an obligation for pension credit in the amount of $2,395,017.30. The AC alleges that if the DI Fund prevails on its claim against NetVersant NE for contributions, the DI Fund will have through June 11, 2004 incurred an obligation for such credit in the amount of $1,454,465.40. The AC alleges that this conduct which is damaging to these funds continued after June 11, 2004. *See* AC, ¶22.

Once the Arbitration Decision issued, the AC alleges that the RICO Defendants knew that continued work by IBEW 2222 members within the Scope of Work clause would trigger the corresponding contribution obligation, yet the RICO Defendants used their control of NetVersant NE to continue such work and accrual of hours without paying the required contributions to the Pension Fund and DI Fund at the rates specified in the Telecommunications Agreements. Even after the First Circuit upheld the Arbitration Decision, the RICO Defendants willfully continued to use the mails and wires to cause false reports to be filed with these funds and to fail to pay the contributions. Instead, the RICO Defendants attempted to conceal the enormous obligation and debt accumulating to the Pension Fund and DI Fund. AC, ¶60-94, 98. Concealment of these hours demonstrates knowledge of the illegal nature of the enterprise. *See United States v. Helbling*, 209 F.3d 226, 238 (3rd Cir. 2000).

5.   The Court has personal jurisdiction over the RICO Defendants.

The Court has personal jurisdiction over the RICO Defendants pursuant to 18 U.S.C. §1965(a) and (b). Section 1965(b) allows other defendants, such as coconspirators, to be added as defendants even though personal jurisdiction is not present under section 1965(a). Under section 1965(a), individual corporate officers are considered to transact the business of the corporation if "the positions of the individuals within the corporation is such that the individuals had actual power to control and exercised the power to control the corporation's transaction of business in the forum." *Abeloff v. Barth*, 119 F.R.D. 315, 329 (D. Mass. 1988). Moreover, the AC alleges that the RICO Defendants,

either themselves or through agents, engaged in activities falling under the Massachusetts' long-arm statute.  See AC ¶6-10.

> B.  The AC's Allegations Are Sufficient To State A Colorable Claim That NetVersant Solutions Is the Alter Ego Of NetVersant NE.

NetVersant Solutions is liable for amounts owed to the Funds and LMCT under ERISA and the LMRA if it is the alter ego of NetVersant NE.  *Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307 (1st Cir. 1998).  In a federal question case, like this one, federal common law controls the alter ego analysis.  *Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry.*, 210 F.3d 18, 25 (1st Cir. 2000), *cert. denied*, 531 U.S. 1014 (2000).  In *Belmont Concrete Corp.*, in finding alter ego status, the court stated the following factors are to be examined: the similarity of the management of the two corporations, similar business purposes, operations, customers, supervision, and anti-union animus.  Id. at 308.  A plaintiff is not required to prove wrongful motive, fraud or anti-union animus as a precondition to a court's finding of alter ego status.  *Id*.  However, "there is no question that a manipulation of the corporate form to circumvent a federal regulatory scheme is sufficiently blameworthy to meet this standard.  *Springfield Terminal Ry.*, 210 F.3d at 34, n.7.  In *Keffer v. H.K. Porter Co.*, 872 F.2d 60, 65 (4th Cir. 1986), a parent corporation was held liable for its subsidiary's debt when it usurped and controlled functions of the subsidiary, by imposing a management and control system that controlled the operations of the subsidiary, by controlling its purse strings, by making the subsidiary requisition funds, by restricting the approval of proposals and contracts, by having common officers and directors, and by siphoning off assets of the subsidiary.

As alleged in the AC, and described *supra*., all of these factors are present in this case. NetVersant Solutions enacted measures to control the detailed daily operations of NetVersant NE in

order to make NetVersant Solutions the actual decisionmaker of NetVersant NE, including whether to renew the Telecommunications Agreement and to report and pay contributions to the Funds. The officers and director of NetVersant NE were all officers of NetVersant Solutions. AC, ¶6-10. The CEO of NetVersant Solutions held weekly conference calls and e-mail communications to control the daily operations of NetVersant NE. It implemented a software program that enabled it to control in real time the daily operations of NetVersant NE. It placed similar financial controls on NetVersant NE that required it to requisition payment of expenses. NetVersant Solutions files consolidated financial statements. AC, ¶56. NetVersant Solutions controls the processing of all payroll of NetVersant NE through its office in Texas and its agents located at NetVersant NE in Boston. AC, ¶51. NetVersant Solutions took control of the accounts receivables and later the accounts themselves through NetVersant National. AC, ¶50. It required NetVersant NE to obtain approval of contracts by the parent. NetVersant Solutions diverted assets of NetVersant NE for its own use.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be allowed.

Respectfully submitted,

RUSSELL F. SHEEHAN, Administrator
By his attorney,

/s/David W. Healey
David W. Healey (BBO# 548262)
DAVID W. HEALEY & ASSOCIATES
77 Franklin Street, Suite 805
Boston, MA 02110
(617) 457-3131